Pittenger v. Gleneagles Homes Ass'n, 2020 NCBC 85.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

ROBERT M. PITTENGER and wife,
SUZANNE B. PITTENGER,

             Plaintiffs,

     v.

GLENEAGLES HOMES
ASSOCIATION, a North Carolina
Nonprofit Corporation; RICHARD B.
BOOTH, JR., individually and as an
Officer and Director of GLENEAGLES
HOME ASSOCIATION; KEVIN J.
ROCHE, individually and as an Officer
and Director of GLENEAGLES HOME
ASSOCIATION; DWIGHT H. BERG,
individually and as an Officer and
Director of GLENEAGLES HOME
ASSOCIATION; DOUG L. LEBDA
(a/k/a DOUGLAS R. LEBDA); and
MEGAN GREULING,

             Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 11280


**ORDER AND OPINION ON
MOTIONS FOR JUDGMENT ON
THE PLEADINGS AND SUMMARY
JUDGMENT**


1. THIS MATTER is before the Court on Defendants Gleneagles Homes Association, Richard B. Booth, Jr., Kevin J. Roche, and Dwight H. Berg's Motion for Judgment on the Pleadings, (ECF No. 28); Defendants Doug Lebda and Megan Greuling's Motion for Summary Judgment, (ECF No. 52); and Defendants Gleneagles Homes Association, Richard B. Booth, Jr., Kevin J. Roche, and Dwight H. Berg's Motion for Summary Judgment, (ECF No. 55), (collectively the "Motions"). The Court, having considered the Motions, materials of record, briefs, and arguments of

counsel, for the reasons stated below, GRANTS the Motions, as a result of which Plaintiffs' Amended Complaint is DISMISSED WITH PREJUDICE.

*Law Office of Kenneth T. Davies, P.C., by Kenneth T. Davies, for Plaintiffs Robert M. Pittenger and Suzanne B. Pittenger.*

*Cranfill, Sumner & Hartzog, LLP, by Patrick H. Flanagan and Meredith F. Hamilton, for Defendants Gleneagles Homes Association, Richard B. Booth, Jr., Kevin J. Roche, and Dwight H. Berg.*

*Wilder Pantazis Law Group, by Raboteau T. Wilder, Jr. and Allison Vaughn, for Defendants Doug L. Lebda (a/k/a Douglas R. Lebda), and Megan Greuling.*

Gale, Judge.

## I. INTRODUCTION

2. Plaintiffs Robert and Suzanne Pittenger (the "Pittengers") and Defendants Doug L. Lebda a/k/a Douglas R. Lebda ("Lebda") and wife, Megan Greuling ("Greuling") own adjacent properties in the Quail Hollow subdivision of Charlotte, North Carolina ("Quail Hollow"). The subdivision is governed by two recorded declarations containing covenants and restrictions, including the requirement that construction plans be approved. Lebda and Greuling secured such approval before constructing their home (the "Lebda-Greuling Property"). The Covenants provide that plan review and approval will be by either the Board of Directors ("Board") of Gleneagles Homes Association ("GHA" or the "Association") or a committee to which the Board delegates authority and responsibility for plan review. The Board delegated that responsibility and authority to an architectural review committee (the "ARC" or "Committee"). Defendants Kevin J. Roche ("Roche") and Dwight H. Berg ("Berg") were at relevant times both officers and directors of

GHA and members of the ARC. Defendant Richard B. Booth, Jr. ("Booth") was at relevant times GHA's President but not an ARC member. Plaintiffs do not bring claims against any other Board or ARC members.

3. The Pittengers contend that the ARC improperly approved the "Lebda-Greuling Property" in violation of multiple covenants, and that these violations cumulatively constitute a nuisance, which the Covenants prohibit. More specifically, the Pittengers contend that the Lebda-Greuling Property has five garage bays rather than the four permitted, does not comply with the required setback on the interior lot line between properties, exceeds the maximum number of authorized stories, does not fit the style of the neighborhood, and is so large as to violate the Pittengers' formerly enjoyed privacy.

4. The Pittengers additionally contend that, when approving the plans, the Board and ARC and their members violated fiduciary duties owed individually to them. Defendants contend that the ARC properly reviewed and approved the plans, barring all of the Pittengers' claims.

5. The Court concludes that the uncontested evidence demonstrates that the ARC's approval of the Lebda-Greuling Property was not arbitrary and capricious but rather made reasonably and in good faith, and such approval precludes each of the Pittengers' claims.

## II. PROCEDURAL HISTORY

6. Plaintiffs commenced this action on June 6, 2018. (Compl., ECF No. 3.) On June 20, 2018, Plaintiffs filed an amended complaint to add Berg as a defendant.

(ECF No. 4.) Plaintiffs have moved to further amend the complaint to assert additional claims against Lebda and Greuling. (Mot. Suppl. Compl., ECF No. 77.) The Court has denied the motion to amend by separate order. (Order on Pls.' Mot. Suppl. Compl., ECF No. 81.)

7. The case was designated as a mandatory complex business case on July 20, 2018, (ECF No. 1), and assigned to the undersigned on July 24, 2018, (ECF No. 2).

8. The Pittengers voluntarily dismissed several claims on October 29, 2019, (ECF No. 66), leaving claims against Lebda and Greuling for violations of the governing covenants, conditions, and restrictions; against GHA, Booth, Roche, and Berg for arbitrary and capricious approval of the Lebda-Greuling Property plans; against GHA for negligence; and against GHA, Booth, Roche, and Berg for breach of fiduciary duty, (Compl. ¶¶ 23–70; Am. Compl. ¶¶ 41–67(a)).

9. On January 30, 2019, GHA, Booth, Roche, and Berg filed their Motion for Judgment on the Pleadings on several claims. On September 30, 2019, Lebda and Greuling first and then GHA, Booth, Roche, and Berg filed their Motions for Summary Judgment seeking to dismiss all claims. All the Motions have been fully briefed and argued and are ripe for resolution.

## III. FACTUAL BACKGROUND

10. The Court does not make findings of fact in ruling on the Motions but summarizes the evidence and contentions for context.

## A. The Parties

11. The Pittengers' residence is located on Lot 9, Block 2 of Section 1, 7330 Baltusrol Lane, Charlotte, North Carolina, 28210 within Mecklenburg County and the Quail Hollow subdivision ("Pittenger Property"). (Compl. ¶ 1.)

12. The Lebda-Greuling Property is located on Lot 8, Block 2 of Section 1, 7318 Baltusrol Lane, Charlotte, North Carolina, 28210 within Mecklenburg County and the Quail Hollow subdivision. (Compl. ¶ 5.)

13. GHA is a North Carolina nonprofit corporation organized for the purpose of administering, maintaining, and enforcing the covenants and restrictions of Quail Hollow. (Compl. ¶ 2.)

14. Booth owns property in Quail Hollow and was at relevant times President of GHA. (Compl. ¶ 3.) He was not an ARC member and did not directly supervise the ARC's determinations, although ARC members kept him generally advised about their review process, and he assisted as needed without exercising any right to vote on its determinations. (Aff. Kevin Roche ¶¶ 8, 29, ("Roche Aff."), ECF No. 56.11.)

15. Roche was at relevant times a GHA officer and director and an ARC member, serving as its primary point of contact with the Board. (Roche Aff. ¶¶ 2, 6.) Roche has owned property in Quail Hollow for twenty years. (Roche Aff. ¶ 4.)

16. Berg was at relevant times a GHA officer and director and an ARC member. (Am. Compl. ¶ 3A; Aff. Dwight H. Berg ¶ 2, ("Berg Aff."), ECF No. 56.12.) He is a licensed general contractor and has lived in Quail Hollow since May 1999.

(Berg Aff. ¶ 4; Dep. Dwight H. Berg 20:3, ("Berg Dep."), ECF No. 56.8.) Berg's spouse owns Lot 7 and a portion of Lot 8 in Block 2 adjacent to the Lebda-Greuling Property. (Am. Compl. ¶ 3A.)

**B.      The Quail Hollow Development**

17.     Quail Hollow is a community planned and developed under a common scheme of development. (Compl. ¶ 12.) The single-family residential community is subject to a Declaration of Covenants, Conditions, and Restrictions, (ECF Nos. 56.2, 73.2), recorded on June 6, 1975, and a Supplementary Declaration of Covenants, Conditions, and Restrictions, (ECF Nos. 56.3, 73.3), also recorded on June 6, 1975, (Compl. ¶ 11), (the Court refers to the Declaration and Supplementary Declaration collectively as the "Covenants").

18.     The Covenants are to be administered through GHA, a nonprofit corporation. (Compl. ¶ 2.) GHA is governed by its Board.

19.     Property owners must obtain prior approval from the Board or ARC before any construction or improvements take place on a lot within Quail Hollow. (Compl. ¶ 15.) The Covenants provide:

> No building, fence, wall or other structure shall be commenced, erected or maintained upon the Properties, nor shall any exterior addition to or change or alteration therein be made until the plans and specifications showing the nature, kind, shape, heights, materials, and location of the same shall have been submitted to and approved in writing as to harmony of external design and location in relation to surrounding structures and topography by the Board of Directors of the Association, or by an architectural control committee composed of three (3) or more representatives appointed by the Board. In the event said Board, or its designated committee, fails to approve or disapprove such design and location withing fifteen (15) days after said plans and specifications have

been submitted to it, approval will not be required, and this Article will be deemed to have been fully complied with.

(Decl. 10–11.)

20. The Board formed the ARC in February 2014. (Dep. Kevin J. Roche 10:1–19, ("Roche Dep."), ECF Nos. 56.7.) During the review of the Lebda-Greuling Property design plans, the ARC consisted of five members, including Roche and Berg, as well as Fred Woltz, Peter Hollett, and Merry Schoonmaker against whom the Pittengers assert no claim. (Roche Dep. 11:4–8.)

21. The Covenants do not provide specific guidelines or a procedure the ARC must follow to review plans.

22. The Covenants grant the ARC the right "to waive, in writing any violation of the designated and approved building location line or either side lot line, horizontal measurement only, provided that such violation does not exceed ten (10%) per cent of the applicable requirements and the violation thereof was unintentional," (Suppl. Decl. 3), but are otherwise silent as to the ARC's authority to waive certain restrictions.

23. The ARC instituted a process to review construction or design plans which calls for three separate stages of review: (1) final plans (exterior design and floor plans, exterior elevations, setbacks from front, golf course, and interior lot lines); (2) materials and colors for all exterior finishes (brick/siding/stucco, doors windows, shutters, and roof); and (3) landscaping plan (driveway materials and color, hardscape, and all other landscape design elements). (March 14, 2017 E-mail String Hart to Roche 1, ("March 14, 2017 E-mails"), ECF No. 73.31.)

24. All ARC decisions are voted on and made by the group on a consensus or majority basis. (Roche Aff. ¶ 7.)

25. The Pittengers contend the ARC improperly approved the Lebda-Greuling Property plans by waiving restrictions that prohibit a residence from exceeding two and one-half stories above ground level, to be located within ten feet of the interior lot line, to have more than four garage bays, and from any use that constitutes a nuisance. (Compl. ¶¶ 19, 30, 43–48.)

26. The Covenants neither define the terms "story" or "ground level" nor incorporate any external source by which those terms are to be defined. The ARC members have consistently interpreted the terms in a manner that measures the height of the residence when viewed from street level.

## C. The ARC's Initial Approval of Construction Plans

27. Architect Harry Schrader ("Schrader") and general contractor Arcadia Builders spearheaded the design and construction of the Lebda-Greuling Property. (Aff. Doug Lebda ¶¶ 5, 10–11, ("Lebda Aff."), ECF No. 52.4.)

28. On March 14, 2017, Schrader contacted Roche to determine the process for the plans to be reviewed by the ARC. (March 14, 2017 E-mails 2.) On March 15, 2017, Roche received the design package Schrader submitted for the Lebda-Greuling Property. (Roche Aff. ¶ 10.) The design package included the final plans for the first stage of approval, including model images of the house with a street view. (March 15, 2017 E-mail Schrader to Roche, ECF No. 73.23.) On March 16, 2017, consistent with prior practice, Roche distributed the plans to the other members of the

Committee by email for their independent review. (Roche Aff. ¶ 10 and Ex. B; Berg Dep. 44:22; Roche Dep. 13:2–21, 49:18–22; March 16, 2017 E-mail String Hollett to Schoonmaker, ECF No. 73.21.) All ARC members reviewed the plans individually. (Berg Dep. 44:22; Roche Dep. 49:18–22.)

29. On March 17, 2017, Roche e-mailed Schrader to confirm receipt of the plans and to inform him that the minimum required setback per the Covenants was ten feet from the interior lot line, whereas the plans had stated the setback as six to eight feet. (Roche Aff. ¶ 11 and Ex. C.) Schrader responded to Roche's inquiry and confirmed that the plans adhered to the ten-foot setback. (Roche Aff. ¶ 11 and Ex. C.)

30. Following votes of approval by four of the five ARC members, Roche sent an approval letter to Schrader relaying that the ARC approved the conceptual design and site placement of the Lebda-Greuling Property. (Aff. Peter Hollett ¶ 13 and Exs. B–C, ("Hollett Aff."), ECF No. 56.9; Roche Aff. ¶ 12 and Ex. D; Berg Dep. 24.)

31. Each of the ARC members who voted to approve the plans testified that he or she was aware of and specifically considered the Covenants' height limitation prior to appoving the plans. Specifically, ARC members testified that they considered the Lebda-Greuling Property to be within the two and one-half story height limitation when viewed from the street and similar in structure to other homes in the neighborhood with walkout basements, (Hollett Aff. ¶ 11; Aff. Merry Schoonmaker ¶ 9, ("Schoonmaker Aff."), ECF No. 56.10; Roche Dep. 49:8–51:6; Berg Dep. 37:20–38:10). One member explained that the ARC "consistently applied and enforced [the

story] requirement" in the past—"by looking at the house from the street and counting the number of levels seen from the street." (Schoonmaker Aff. ¶ 9.)

32. The ARC members also testified that they considered the garage bay covenant before voting to approve the plans. Schoonmaker testified that she was aware that the Covenants limited a residence to four garage bays, but voted to approve the plans having herself been previously approved for a fifth garage bay as well as a porte cochere and because she believed the Covenants to be outdated based on current trends in the neighborhood. (Schoonmaker Aff. ¶ 7.) Berg testified that he examined the Lebda-Greuling Property plans in comparison to "the covenants and the current situations in the neighborhood," (Berg Dep. 44:24–25), and voted to waive the garage restriction given where the neighborhood was trending and that other homes in the neighborhood had previously been approved for five-car garages, (Berg Dep. 45:1–15). Roche considered that the number of garage bays fit with the scale of the Lebda-Greuling Property and seemed to be appropriate relative to what could or could not be seen from the street. (Roche Dep. 27:8–28:16.)

**D. ARC Involvement During Construction**

33. In late 2017, construction began on the Lebda-Greuling Property. (Def. Lebda Answer ¶ 17, ECF No. 11; Def. Greuling Answer ¶ 17, ECF No. 12.)

34. On December 1, 2017, Plaintiffs' counsel by letter notified Lebda and Greuling of the Pitteners' contention that the proposed construction violated the Covenants in spite of the ARC's approval, referring specifically to the number of allowed garage bays, the two and one-half story limitation, and the ten-foot interior

setback. (Am. Compl. ¶ 20; 1 Dec. 2017 Letter from Davies to Lebda & Greuling, ECF No. 73.6.) On December 8, 2017 Plaintiffs' counsel similarly by letter notified GHA, Booth, and Roche, of the Pittengers' contentions. (Compl. ¶ 21; 8 Dec. 2017 Letter from Davies to Booth and Roche, ECF No. 73.7; Roche Aff. ¶ 13 and Ex. E.)

35. Lebda asked Schrader to consider the issues the Pittengers raised. (Lebda Aff. ¶¶ 16–18.) Schrader advised Lebda that the allegations were incorrect and that the house complied with the Covenants. (Lebda Aff. ¶ 18.)

36. Roche advised the other ARC members of the contentions in Plaintiffs' letter. (Roche Aff. ¶ 14 and Ex. F.) On December 14, 2017, the ARC members and Board met to address the issues the Pittengers raised and reached consensus that the Lebda-Greuling Property "complied with the two and one half story requirement and permission for the house to have five garage bays was reasonable considering the size and scale of the home, the location of the garage bays, and no identified negative impact on the neighborhood." (Roche Aff. ¶ 15 and Ex. G.)

37. As construction proceeded, the ARC, GHA, Lebda, and Greuling learned that a portion of the southern wing of the home contained a cantilever bay or bump-out, which infringed on the required internal setback line. (Lebda Aff. ¶ 19; Schoonmaker Aff. ¶¶ 13–14; Roche Aff. ¶ 16.) The ARC members reviewed the infringement and did not favor granting a waiver for the bump-out. (Roche Aff. ¶¶ 17, 19–20 and Exs. I, K–M.) Lebda requested an onsite meeting with the ARC members to discuss the issue. (Roche Aff. ¶ 21.) Four of the five ARC members and one member of the Board, Fred Wilkerson, attended a meeting held at the Lebda-

Greuling Property on February 9, 2018. (Roche Aff. ¶ 21.) On February 13, 2018, four of the five ARC members met with all but one member of the Board to address the setback violation arising from the bump-out. (Roche Aff. ¶ 22.) All attendees at this meeting agreed that the bump-out violated the ten-foot setback, that the violation was caused by a survey and building error, that the violation was fixable by removing the bump-out on the southern side of the house, and that the ARC should require the setback violation be cured by eliminating the bump-out. (Aff. Raboteau T. Wilder, Jr. at Ex. 12, ("Wilder Aff."), ECF No. 52.1; Roche Aff.¶ 22 and Ex. N.) The ARC relayed this decision to Lebda and Schrader on February 13, 2018. (Roche Aff. ¶ 23 and Ex. O.) Lebda instructed Schrader to change the design on the southern side of the house to comply with the ARC's decision. (Lebda Aff. ¶ 19.)

38. The Pittengers also raised concerns that the windows on the side of the Lebda-Greuling Property facing the Pittenger Property would allow members of Lebda and Greuling's household to see into the Pittengers' backyard eliminating any privacy formerly enjoyed by the Pittengers. (Lebda Aff. ¶ 21.) To address the concern, Lebda directed Schrader to replace the originally designed full-size windows on that side of the house with transom windows which are smaller and located higher on the walls to allow light to enter the rooms but prevent occupants of the rooms from having a direct view out of the windows. (Lebda Aff. ¶ 21.)

39. On March 7, 2018, Schrader submitted the proposed site plan for the HVAC units, gas meter, and pool equipment to the ARC for review. (Roche Aff. ¶ 25 and Ex. Q.) Each ARC member reviewed the submission individually and voted to

approve the plans as long as the landscaping plan included shielding for the exterior HVAC units. (Roche Aff. ¶ 25 and Ex. Q.)

40. On April 2, 2018, Schrader submitted the proposed exterior finishes to the ARC for review and approval. (Roche Aff. ¶ 26.) The ARC voted to approve the proposed finishes. (Roche Aff. ¶ 26 and Exs. R, S.)

41. Roche met with Lebda and Greuling's builder, Robby Bowers, at the Lebda-Greuling Property on April 5, 2018, to review samples of the external materials. (Roche Aff. ¶ 26.) During this onsite meeting, Bowers alerted Roche to another possible violation of the interior setback related to the installation of a 4-inch thick limestone veneer around the foundation of the house, which when finished, because of the surveying error, would encroach 2 to 2.5 inches into the ten-foot setback on the southwest corner of the house. (Roche Aff. ¶ 27; Lebda Aff. ¶ 20.) Roche brought this to the attention of the other ARC members. (Roche Aff. ¶ 27.) The ARC voted to grant a waiver of the setback violation based on the previous agreement of Lebda and Greuling to remove the bump-out as well as the authority granted to the ARC in the Covenants to waive unintentional setback violations when they do not exceed 10% of the applicable requirement. (Schoonmaker Aff. ¶ 15 and Ex. D; Roche Aff. ¶¶ 27–28 and Exs. T–V.) Roche testified that he "did not believe that a 2 to 2.5 inch encroachment on the back left corner of the [Lebda-Greuling Property] would have any detrimental impact on the neighborhood and that the setback requirement waiver contemplated such instances such as the one at hand." (Roche Aff. ¶ 27.)

42. On June 6, 2018, Plaintiffs filed their initial complaint.

43. On December 21, 2018, Robby Bowers submitted a proposed landscaping plan for the Lebda-Greuling Property. (Roche Aff. ¶ 31 and Ex. W.) Roche distributed the plan to the other ARC members as well as to Booth and GHA Board member Fred Wilkerson. (Roche Aff. ¶ 31.) ARC members participated in a conference call to discuss the proposed landscaping plan and unanimously voted to deny the plan as submitted. (Roche Aff. ¶ 31.)

44. On January 7, 2019, all ARC members met onsite at the Lebda-Greuling Property with the landscape architects and builder to communicate their concerns with the submitted landscape design plan. (Roche Aff. ¶ 32.)

45. On February 12, 2019, the landscape architects submitted a revised plan to the ARC. (Roche Aff. ¶ 33 and Ex. X.) On February 19, 2019, all members of the ARC again met onsite on with the landscape architects and builder, after which they voted to approve the landscaping plan. (Roche Aff. ¶ 34.)

46. Construction of the Lebda-Greuling Property was completed sometime after May 15, 2019. (Wilder Aff. at Ex. 25.)

### E. Expert Testimony

47. The Pittengers have offered expert testimony that focuses on the contention that the Lebda-Greuling Property exceeds the two-and-one-half-story height limitation. As mentioned, the ARC members interpreted the Covenants to provide that a home could not exceed two and one-half stories as viewed from street level, and that the Lebda-Greuling Property complies with the restriction pursuant

to this construction. Plaintiffs' expert architects Gerard Peer and Donald Duffy contend instead that the southern wing of the Lebda-Greuling Property is three and one-half stories when measured from ground level as opposed to street level. (Aff. Gerard W. Peer, FAIA, ¶ 8, ECF No. 73.10; Aff. Donald Leroy Duffy Architect ¶ 15, ECF No. 73.11.) Defendants' expert architects Robin Roberts and Josh Allison contend the Lebda-Greuling Property is a two-story structure with a basement which complies with the Covenants. (Aff. Josh Allison ¶¶ 11–18, ECF No. 52.2; Aff. Robin Roberts, AIA, NCARB, ¶ 7(b), ECF No. 56.15.)

## IV. STANDARD OF REVIEW

### A. Summary Judgment

48. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C. R. Civ. P. 56(c). "If findings of fact are necessary to resolve an issue as to a material fact, summary judgment is improper." *Moore v. Galloway*, 35 N.C. App. 394, 396, 241 S.E.2d 386, 387 (1978).

49. "[A]n issue is material if the facts alleged are such as to constitute a legal defense or are of such nature as to affect the result of the action, or if the resolution of the issue is so essential that the party against whom it is resolved may not prevail." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534, 180 S.E.2d 823, 830 (1971). Thus, on summary judgment, the burden is on the moving party to demonstrate either "an essential element of the opposing party's claim is nonexistent"

or by "showing through discovery that the opposing party cannot produce evidence to support an essential element of his or her claim." *Lowe v. Bradford*, 305 N.C. 366, 369, 289 S.E.2d 363, 366 (1982) (citations omitted).

50. "If the moving party satisfies its burden of proof, then the burden shifts to the non-moving party to 'set forth *specific facts* showing that there is a genuine issue for trial.' " *Id.* at 369–70, 289 S.E.2d at 366 (emphasis added in *Lowe*) (quoting N.C. R. Civ. P. 56(e)). In deciding whether to grant a motion for summary judgment, the Court "must view all evidence in the light most favorable to the nonmoving party." *Osborne v. Hodgin*, 98 N.C. App. 111, 114, 389 S.E.2d 629, 631 (1990) (citing *Walker v. Westinghouse Elec. Corp.*, 77 N.C. App. 253, 258, 335 S.E.2d 79, 83 (1985), *disc. rev. denied*, 315 N.C. 597, 341 S.E.2d 39 (1986)).

51. Interpretation and construction of restrictive covenants may be considered upon summary judgment "unless a material issue of fact exists as to the validity of the contract, the effect of the covenant on the unimpaired enjoyment of the estate, or the existence of a provision that is contrary to the public interest." *Page v. Bald Head Ass'n*, 170 N.C. App. 151, 155, 611 S.E.2d 463, 466 (2005).

## V.    ANALYSIS

52. Plaintiffs contend that the evidence viewed in their favor is sufficient to allow a trier of fact to conclude that: (1) ARC members acted arbitrarily and capriciously when waiving the height requirement without adequate guiding standards and when waiving a manifest violation of the specific covenant precluding a fifth garage bay; (2) ARC members owed Plaintiffs a fiduciary duty because of their

total control over property within the planned development, and the ARC's approval of the Lebda-Greuling Property plans breached that duty; (3) ARC members cannot justify their approval based on matters they did not actually consider when approving the plans; and (4) all things considered, the Lebda-Greuling Property constitutes a nuisance.

53. Defendants contend that the Plaintiffs' evidence supports nothing more than a disagreement as to whether the Lebda-Greuling Property fits the scale of the Quail Hollow subdivision and falls short of meeting Plaintiffs' burden of showing that the ARC's approval was not reached reasonably and in good faith. Defendants further contend that any fiduciary duty the Board or ARC members may have had was owed to GHA and the property owners collectively rather than to the Pittengers individually. Lebda and Greuling contend that they proceeded with the proper approval process delineated in the Covenants and administered by the ARC, and such approval bars the Pittengers' claims.

54. The Court begins its analysis by determining the proper standard of conduct owed by ARC members when reviewing plans submitted to them.

**A.      The ARC Was Required to Act Reasonably and in Good Faith**

55. North Carolina case law establishes that "restrictive covenants are contractual in nature, and that acceptance of a valid deed incorporating covenants implies the existence of a valid contract with binding restrictions." *Moss Creek Homeowners Ass'n v. Bissette*, 202 N.C. App. 222, 228, 689 S.E.2d 180, 184 (2010)

(citing *Rodgerson v. Davis*, 27 N.C. App. 173, 178, 218 S.E.2d 471, 475, *disc. review denied*, 288 N.C. 731, 220 S.E.2d 351 (1975)).

56. As a general matter, restrictive covenants may be enforced by and against any grantee "[w]here the owner of a tract of land subdivides it and sells distinct parcels thereof to separate grantees, imposing restrictions on its use pursuant to a general plan of development or improvement." *Sedberry v. Parsons*, 232 N.C. 707, 710, 62 S.E.2d 88, 90 (1950). The Covenants expressly grant a right to both GHA and individual property owners to enforce the Covenants by court action. (Suppl. Decl. 5.)

57. The Pittengers' individual rights must be balanced against the authority vested in the ARC to approve design and landscape plans for development within Quail Hollow. Plaintiffs took their property subject to that authority. "A purchaser of land has the duty to examine every recorded deed or instrument in his line of title; he is conclusively presumed to know the contents of such instruments and is put on notice of any fact or circumstance affecting his title which is disclosed in such instruments." *Four Seasons Homeowners Ass'n v. Sellers*, 62 N.C. App. 205, 212, 302 S.E.2d 848, 853 (1983) (citing *Lamica v. Gerdes*, 270 N.C. 85, 153 S.E.2d 814 (1967); *Turner v. Glenn*, 220 N.C. 620, 18 S.E.2d 197 (1942)); *see also Sedberry*, 232 N.C. at 710–11, 62 S.E.2d at 90–91 (stating that deed restrictions in purchaser's chain of title are valid and enforceable against purchaser even if not appearing in purchaser's immediate deed).

58.     As a general proposition, "North Carolina follows the rule of strict construction when interpreting restrictive covenants. That is, any ambiguities will be resolved in favor of unrestricted use. But this rule must not be applied to defeat the plain and obvious purposes of the restriction." *Barber v. Dixon*, 62 N.C. App. 455, 457, 302 S.E.2d 915, 916–17 (1983) (citing *Long v. Branham*, 271 N.C. 264, 268, 156 S.E.2d 235, 239 (1967)).

59.     More often, cases challenging an architectural review committee's decision arise in the context of a homeowner contending that the committee refused a homeowner's request as to a particular use of the homeowner's property, contrary to the policy favoring unrestricted use. In that context, courts employ a standard of review which defers to a committee's determination that is made reasonably and in good faith and conditions a judicial challenge to a demonstration that the committee acted arbitrarily and capriciously.

> When interpreting protective covenants requiring submission of plans and prior consent to construction, this Court has affirmatively stated *such clauses,* even if vesting the approving authority with broad discretionary power, are *valid and enforceable* so long as the authority to consent is exercised *reasonably and in good faith.* Importantly though, the exercise of the authority to approve the house plans *cannot be arbitrary.* There must be some standards. Where these standards are not within the restrictive covenant itself, they must be in other covenants stated or designated, or they must be otherwise clearly *established in connection with some general plan or scheme of development.* Consequently, most jurisdictions that have dealt with this issue have found that these covenants are enforceable as long as the determining body makes the decision reasonably and in good faith.

*Pendleton Lake Homeowners Ass'n, Inc. v. Carnell*, 2006 N.C. App. LEXIS 242, at *5–6 (2006) (emphasis added in *Pendleton*) (internal quotation marks and citations omitted); *see also Raintree Homeowners Ass'n, Inc. v. Bleimann*, 342 N.C. 159, 164,

463 S.E.2d 72, 75 (1995) (holding a committee acted reasonably where defendants "produced no evidence that the ARC acted arbitrarily or in bad faith when reviewing defendants' application or when making its decision"); *Smith v. Butler Mtn. Estates Property Owners Ass'n*, 90 N.C. App. 40, 48, 367 S.E.2d 401, 407 (1988); *Boiling Spring Lakes Div. of Reeves Telecom Corp. v. Coastal Services Corp.*, 27 N.C. App. 191, 195, 218 S.E.2d 476, 478 (1975) (noting that decisions that are arbitrary, capricious, or made in bad faith are not found based on disagreement as to aesthetic looks but rather on whether the ARC made appropriate considerations when exercising its approval authority).

60. In contrast, this litigation arises from an architectural committee's approval of a use rather than its denial. The Court discerns no reasoned basis that the standard by which to measure the committee's decision is any different in this context and remains an inquiry into whether Plaintiffs have forecasted evidence sufficient to find that the ARC failed to act reasonably and in good faith but rather acted arbitrarily and capriciously.

61. On the facts of this case, the inquiry does not turn on whether the committee acted arbitrarily and capriciously by failing to consider the Covenants upon which the challenge is made. To the contrary, Plaintiffs' counsel brought each of their contentions to the ARC before it approved the plans. The claims depend on whether the ARC or its members acted arbitrarily and capriciously in the manner in which they applied the specific covenants.

62. North Carolina courts recognize that a review committee can reasonably consider how covenants have been applied in previous evaluations and in consideration of the overall scheme of development. *Raintree*, 342 N.C. at 165, 463 S.E.2d at 75 (holding that an architectural review committee's denial of an application for vinyl siding was reasonable and made in good faith in part because the committee's decision was consistent with past denials where the committee found vinyl siding inappropriate for the community); *see also Pendleton*, 2006 N.C. App. LEXIS 242, at *8–9 (holding that, where there is evidence a homeowners' association considered the restrictive covenants at issue in light of the overall scheme of development, this suggests the association acted reasonably and in good faith).

63. When reviewing the reasonableness of a committee's decision, the degree to which the committee paid specific attention to covenant requirements is relevant. For example, the North Carolina Court of Appeals found relevant that a review committee considered a homeowner's proposal twice, visited the homeowner's lot personally to inspect the site of the proposed garage, consulted with other lot owners in the subdivision, and suggested alternate sites for the proposed garage. *Pendleton*, 2006 N.C. App. LEXIS 242, at *8.

64. The Pittengers contend that the Court should apply a stricter standard of review based on their contention that the ARC members owed an individual fiduciary duty to the Pittengers. They argue that such a fiduciary duty arises from the total domination and control the ARC has over a property owner's rights within the Quail Hollow subdivision, and because homeowners are mandatory members of

the Association subject to the threat of foreclosure if assessments are not paid, the Association "hold all the cards." Of course, the Pittengers freely and voluntarily purchased their property pursuant to the Covenants which expressly vest the authority to review and approve design and construction plans on behalf of GHA in the Board or the ARC to which it delegates authority and responsibility.

65. The Court finds no reasoned factual or legal basis to impose on the Board or ARC members an individual fiduciary duty to individual homeowners beyond their duty owed to the Association to implement the Covenants reasonably and in good faith. Any fiduciary duty directors and officers of a homeowner's association owe is to the homeowner's association they represent. *Conleys Creek Ltd. P'ship v. Smoky Mountain Country Club Prop. Owners Ass'n, Inc.*, 255 N.C. App. 236, 251, 805 S.E.2d 147, 157 (2017), *appeal dismissed, review denied*, 370 N.C. 695, 811 S.E.2d 596 (2018). Having been delegated the authority to act on behalf of the Board, their duty is delineated by N.C.G.S. § 55A-8-30, which requires that:

> [A] director must discharge his duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances and in a manner the director reasonably believes to be in the best interests of the corporation. In doing so, a director may rely on information, opinions, and statements provided by legal counsel or other professionals.

*Taddei v. Vill. Creek Prop. Owners Ass'n, Inc.*, 220 N.C. App. 487, 493, 725 S.E.2d 451, 455 (2012) (citing N.C.G.S. § 55A–8–30(a), (b)(2) (2009)).

66. The Court concludes that the proper standard to be applied is whether Plaintiffs can demonstrate that the ARC and Board members when reviewing the

Lebda-Greuling Property plans acted arbitrarily and capriciously rather than reasonably and in good faith.

**B.  Adequacy of Evidence to Support a Finding that the ARC's Approval Was Arbitrary and Capricious**

67.  The Court separately addresses each Covenant provision on which the Pittengers rely.

**(1)  The Fifth Garage Bay**

68.  The Covenants, recorded in 1975, include the height limitation and garage limitation in the same provision which reads:

> All lots shall be used for residential purposes only and no structure shall be erected, placed or permitted to remain on any lot other than one detached single-family dwelling not to exceed two and one-half stories in height above ground level, a private garage or carport for not more than four cars and other outbuildings incidental to residential use of any lot.

(Suppl. Decl. 1.)

69.  The evidence is uncontested that the ARC had voted on prior occasions to waive the requirement that a garage be limited to four cars, and did so in light of the evolving nature of the Quail Hollow community.  The evidence does not include any indication that the ARC's determination in that regard had been previously challenged.

70.  Courts have recognized that architectural review committees may be afforded broad authority, including to waive restrictive covenants, in order to act consistently with the established principle of law that restrictive covenants should be interpreted in favor of unrestricted use and development of land.  *Long*, 271 N.C. at 268, 156 S.E.2d at 239 (citation omitted).

71.   Berg testified that he believed the ARC could waive the garage restriction given where the neighborhood was trending and that other homes in the neighborhood already had over four garage bays.  (Berg Dep. 44:22–45:25.)  Roche testified that he thought that the number of garage bays at the Lebda-Greuling Property fit with the scale of the house and seemed to be appropriate relative to what you could or could not see from the street.  (Roche Dep. 27:9–28:16.)

72.   ARC member Schoonmaker stated that:

> While reviewing the proposed plans, I noticed the plans called for five garage bays.  The restrictive covenants call for no more than four garage bays.  However, my home has five garage bays and was approved by the Board of Directors which was acting as the ARC at the time we submitted plans for approval in or about 2009.  I brought this to the attention of the other members of the ARC and we considered whether or not to approve plans with the proposed five garage bays.  Considering the size and scale of the house in the proposed plans, the layout of the garages bays, the fact that there are other homes in the neighborhood, including mine, with more than four garage bays, I determined that five garage bays would not negatively impact the neighborhood and voted to approve the plans.

(Schoonmaker Aff. ¶ 7.)

73.   The Court concludes that the ARC is vested with discretion, within reason, to conform its enforcement of the Covenants to the changing nature of the overall development as it matures.  The Court further concludes that the ARC members reasonably considered their prior waiver of the garage restriction, and the forecast of Plaintiffs' evidence is not adequate to allow a fact finder to conclude that the ARC or its members acted in bad faith or arbitrarily and capriciously when approving the fifth garage bay for the Lebda-Greuling Property in consideration of

the development and evolution of the Quail Hollow community at the time of their review.

**(2)     The De Minimis Setback Violation from Survey Error**

74.     Defendants acknowledge that a small portion of a thin layer of limestone on the exterior of the Lebda-Greuling Property infringes into the setback area by approximately two inches due to an unintentional surveying error.

75.     The Covenants expressly grant the ARC the authority to waive "any violation of the designated and approved building location line on either side lot line . . . provided that such violation does not exceed ten (10%) per cent of the applicable requirements and the violation thereof was unintentional." (Suppl. Decl. 3.)

76.     Accordingly, the Court concludes that the Pittengers have not forecasted evidence upon which a court or jury could reasonably conclude that Defendants acted arbitrarily or capriciously, unreasonably or without good faith when waiving the de minimis setback violation.

**(3)     Two and One-Half Story Height Limitation**

77.     The evidence presents the contested issue of whether the ARC reasonably and in good faith concluded that the Lebda-Greuling Property conformed with the Covenants' requirement that a property not exceed "two and one-half stories in height above ground level."  Here, the ARC did not vote to waive the requirement but rather concluded that the plans did not violate the restriction.

78.     The experts offer differing opinions as to how the determination should have been made when the Covenants did not define the terms "story" or "above ground level."  When the ARC members made their determination, they were fully

aware of the height restriction, but considered their interpretation consistent with the historical practice of measuring the number of stories as viewed from street level. They had additionally been assured by Lebda and Greuling's architect that the Pittengers' contention was not supported by the Covenants.

79. Each ARC member who voted to approve the Lebda-Greuling Property plans testified that they expressly considered the height limitation. (Hollett Aff. ¶ 11; Schoonmaker Aff. ¶ 9; Roche Dep. 49:8–51:6; Berg Dep. 37:21–24.)

80. Roche testified that prior to approving the Lebda-Greuling plans, Quail Hollow had a number of homes that, due to ground slopes, appear to be three levels from particular vantage points. (Roche Dep. 50:21–24.) However, the ARC or Board had previously approved plans for those properties which appeared no higher than two and one-half stories above ground level when viewed from the street. The ARC members concluded that they should apply the same criteria to the Lebda-Greuling Property. *See Raintree*, 342 N.C. at 164, 463 S.E.2d at 75 ("Plaintiff's reliance on past practices and policies does not suggest that the ARC was being unreasonable or arbitrary . . . Reliance on this past finding was not an example of bad faith."); *Smith v. Butler Mountain Estates Prop. Owners Ass'n*, 90 N.C. App. 40, 48, 367 S.E.2d 401, 407 (1988) (holding a key inquiry in determining whether a review committee exercised its authority reasonably and in good faith is whether the proposed structure is consistent with the scheme of development of the rest of the neighborhood).

81. The Court concludes that when viewed most favorably to Plaintiffs, the evidence, including expert testimony, demonstrates a difference of opinion as to how

the height restriction within the Covenants was to be applied but fails to forecast a basis upon which a court or jury could reasonably conclude that Defendants acted arbitrarily or capriciously, unreasonably or without good faith when approving the Lebda-Greuling Property as consistent with the height restriction.

82. In sum, the Court concludes that Plaintiffs have failed to forecast evidence upon which a court or jury could conclude that the Board, the ARC, or its members acted arbitrarily and capriciously in approving the Lebda-Greuling Property, either by reason of the restrictions as to garage bays, setback requirement, or height.

## C. Plaintiffs' Nuisance Claim

83. The Covenants provide that: "No noxious or offensive activity shall be conducted upon any lot or in any dwelling nor shall anything be done theron or therein which may be or may become an annoyance or nuisance to the neighborhood." (Decl. 11.) This provision is contained within the section of the Covenants providing "Use Restrictions," rather than within the sections providing design restrictions.

84. The Pittengers do not bring a common law nuisance claim.

85. Plaintiffs' nuisance claim is essentially that the covenant violations the ARC endorsed have allowed Lebda and Greuling's use of their home to invade Plaintiffs' privacy and enjoyment of their property. The claim fails to the extent it depends upon an initial finding that the ARC did not approve the construction reasonably and in good faith. Second, the record evidence reveals nothing further

about any actual noxious or offensive use of the Lebda-Greuling Property to which to apply the Covenants.

86. The Court concludes that the Pittengers have not forecasted evidence upon which a court or jury could reasonably conclude that the Lebda-Greuling Property constitutes a nuisance as defined by the Covenants.

### D. Negligence Claim Against Defendant GHA

87. Plaintiffs presented a negligence claim against GHA that essentially restates the claim of breach of fiduciary duty and fails for the same reasons. To succeed in negligence, "a plaintiff must establish that the defendant owed the plaintiff a legal duty, that the defendant breached that duty, and that the plaintiff's injury was proximately caused by the breach." *Martishius v. Carolco Studios, Inc.*, 355 N.C. 465, 473, 562 S.E.2d 887, 892 (2002) (citing *Hunt v. N.C. Dep't. of Labor*, 348 N.C. 192, 195, 499 S.E.2d 747, 749 (1998)). Plaintiffs have not defined any duty upon which a negligence claim would rest that is distinct from the ARC's duty to act reasonably and in good faith when approving the plans submitted to it for approval.

88. Accordingly, the Court concludes that Defendant GHA is entitled to summary judgment on Plaintiffs' negligence claim.

### VI. CONCLUSION

89. For the foregoing reasons, the Court concludes that Plaintiffs have not forecasted evidence upon which a court or jury could reasonably conclude that they are entitled to relief on any claim presented by their Amended Complaint.

90. The Court GRANTS the Defendants' Motions for Judgment on the Pleadings and Motion for Summary Judgment, and Plaintiffs' amended complaint and each of its claims is DISMISSED WITH PREJUDICE.

This the 1st day of December, 2020.

/s/ James L. Gale

James L. Gale
Senior Business Court Judge